UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT GRAHAM ARVIN, JR.,

      Plaintiff                               Civil Action No. 19-11048

v.                                    HON.  ROBERT H. CLELAND
                                        U.S. District Judge
                                        HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Robert Graham Arvin, Jr. brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income under Title XVI of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment [Docket #18] be GRANTED and that Plaintiff's motion [Docket #16] be DENIED.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") on November 17, 2016, alleging disability as of April 2, 2013 (Tr. 174).  Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on April 25, 2018 in Toledo, Ohio (Tr. 31).   Administrative Law Judge ("ALJ") Carrie Kerber presided.   Plaintiff, represented by non-attorney representative Alice Patterson, testified, as did Vocational Expert ("VE") Charles McGee (Tr. 37-61, 62-66).  On August 24, 2018, ALJ Kerber found that Plaintiff was not disabled (Tr. 17-26).  On February 6, 2019, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on April 10, 2019.

## II.  BACKGROUND FACTS

Plaintiff, born October 13, 1984, was 33 at the time of the ALJ's determination (Tr. 26, 174).  He completed ninth grade and worked previously as a auto repairer, mechanic, and stock person (Tr. 197-198).  He alleges disability as a result of bipolar disorder, epilepsy, gastroperisis, hiatal hernia, and an unhealed rectal tear (Tr. 196).

### A.    Plaintiff's Testimony

*Plaintiff's representative prefaced her client's testimony by amending the alleged onset of disability date to November 11, 2016* (Tr. 12, 35).  *She noted that Plaintiff's current diagnoses and conditions (aside from those listed above) included Post Traumatic Stress Disorder ("PTSD") and memory and concentrational problems* (Tr. 35-36).

Plaintiff then offered the following testimony:

-2-

He lived with his parents in Monroe, Michigan (Tr. 38-39). He quit school after ninth grade but later obtained a GED (Tr. 39-40). He had four children, aged 17, 13, 9, and 1, but did not have custody of any of them (Tr. 40). His child visitation was "spotty" (Tr. 40). He did not hold a current driver's license due to periodic epilepsy attacks (Tr. 41). He either took a bus or walked as required, adding that a grocery store was within walking distance of his residence (Tr. 41). Since ceasing work as a 7-Eleven cashier in 2013, he had not held any jobs (Tr. 42). Prior to holding the cashier position, he worked as a fiberglass fabricator (Tr. 42). His condition had declined since making an earlier, eventually denied application for SSI in 2013 (Tr. 43). He experienced worsening anxiety, gastrointestinal problems, and "multiple hemorrhoids" (Tr. 43). His anxiety, diagnosed as agoraphobia, was triggered by being around people and the fear of requiring re-hospitalization for a now-resolved staph infection (Tr. 43). He worried about being a burden to his parents (Tr. 43-44).

Plaintiff sought emergency treatment periodically for vomiting (Tr. 45). He acknowledged medical statements that the cyclic vomiting was related to marijuana abuse, but discounted the finding that his marijuana use and vomiting were connected (Tr. 45). He reported weekly marijuana use (Tr. 45-46), and held a medical marijuana card (Tr. 59). Plaintiff had recently undergone respiratory testing for Chronic Obstructive Pulmonary Disease ("COPD") but denied that the marijuana use exacerbated his lung condition (Tr. 47). He currently used an inhaler and experienced problems climbing stairs and running (Tr. 47). In response to the ALJ's observation that a February, 2017 pulmonary function test was

negative for COPD, Plaintiff stated that he had been told that he had "severe COPD and advanced lung disease" (Tr. 60-61).

Plaintiff experienced Irritable Bowel Syndrome ("IBS") and used the bathroom three to four times a day under regular circumstances and more often when anxious (Tr. 48). The stress of being a cashier also brought on an epileptic seizure (Tr. 49). The seizures were accompanied by auras, dizziness, and hot and cold sweats (Tr. 49). As to the condition of bipolar disorder, the "lows" included daily crying jags and were more severe than the "highs" (Tr. 50). His current medications included Topamax, Lamictal, Prilosec, Amitriptyline, Fioricet, and an antidepressive (Tr. 50). He had taken one series of injections for migraine headaches that occurred daily and required Plaintiff to shut himself in a darkened room (Tr. 51). He performed kitchen and laundry chores as able and contributed to the care of the family dog (Tr. 52). He was unable to lift more than 15 pounds due to hemorrhoids (Tr. 53). He made the two-block walk to the grocery store for "little things" when he felt that he could "face people" (Tr. 53). He was able to make the two-block walk without significant problems but was unable to stand for more than 10 minutes without hip and leg pain (Tr. 53-54).

Plaintiff experienced poor sleep hygiene and seldom saw extended family or friends (Tr. 55-56). He kept his bimonthly doctors' appointments without fail (Tr. 56). His hobbies were limited to listening to music (Tr. 56). He attributed his inability to play an instrument to Attention Deficit Disorder ("ADD"). He was able to text from his smart phone but did not

engage in social media extensively  (Tr. 58).

### B.    Medical Evidence[1]

### 1. Treating Sources

January, 2016 gastroenterology records note a "dramatic improvement" in nausea after treatment (Tr. 289).  Plaintiff denied acute complaints other than constipation (Tr. 289). An MRI of the brain from the same month was normal (Tr. 542).  Omar Ahmad, M.D. noted Plaintiff's denial of medication side effects (Tr. 531).

January, 2016 psychological therapy records by Eliot Garcia note that Plaintiff discounted a medical treater's finding that the condition of nausea was caused by marijuana use (Tr. 709).  Plaintiff reported that his daily marijuana use helped with his anxiety (Tr. 709).  He stated that his goal was to get SSI benefits (Tr. 709).  Psychological therapy notes from the following month note that he was "happy" but "nervous" regarding his girlfriend's pregnancy (Tr. 705).

Dr. Ahmad's treating records from February and April, 2016 were  unremarkable (Tr. 527, 529).    Therapy records note that Plaintiff attributed recent nausea to a medication

---

[1]

In an application for SSI, the relevant period is the date of the application through the date of the ALJ's determination. *See Roberts v. Colvin*, 2015 WL 5432388, at *2 (E.D.Mich. July 22, 2015)(*citing Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1233 (6th Cir.1993))("'proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date'").  Thus, discussion of the records predating Plaintiff's November, 2016 application are included for background purposes only.

change (Tr. 692, 916).  A neurological evaluation was unremarkable (Tr. 940).  Later the same month, Plaintiff reported that he was "suicidal" after his girlfriend left him (Tr. 690). Notes from the following week state that he had suicidal ideation but denied plans (Tr. 680). The same month, Matthew Sturm, M.D. attributed Plaintiff's ongoing constipation and tendency towards nausea to daily marijuana use (Tr. 1639).  Therapy records from the following month note the condition of cannabis dependence (Tr. 675).

Dr. Ahmad's June, 2016 record note Plaintiff's report of one 10-minute seizure in the past two months (Tr. 525).  The same month, Plaintiff sought emergency treatment for vomiting (Tr. 317).  He denied headaches (Tr. 308).  He was discharged in stable condition (Tr. 318).  A June, 2016 chest x-ray was essentially unremarkable (Tr. 493).  A CT of the abdomen from the same month was also unremarkable (Tr. 491).   Therapy notes state that Plaintiff went "out with his friends to keep [] busy" (Tr. 587, 662).  In August, 2016, Plaintiff denied seizures in the past two months (Tr. 522).  A physical examination by Dr. Ahmad was unremarkable (Tr. 522).  Therapy notes from the following month note Plaintiff's report of "massive migraines" (Tr. 650).  Plaintiff reported anxiety due to the fact that his estranged girlfriend was giving birth to their child the same week (Tr. 650).  Later the same month he reported that he was attending a friend's wedding (Tr. 648).  October, 2016 records by Rohit Verma, M.D. noted no reports of headaches (Tr. 1041).  In November, 2016, Dr. Ahmad's records note that Plaintiff denied seizures but reported headaches  (Tr. 519, 1533).

December, 2016 therapy records note that Plaintiff was friendly and cooperative (Tr.

-6-

640).   Psychiatrist Paul Gutterman, M.D. noted the ongoing condition of cannabis dependence (Tr. 569).  His "strengths" were deemed to include the ability to interact with others (Tr. 564).  Dr. Verma's records again noted the absence of headaches (Tr. 1039).  The same month, Plaintiff was admitted to the hospital for renewed nausea (Tr. 636).  Lab results and imaging studies were unremarkable (Tr. 969, 978, 986, 991-993).  An initial chest x-ray was unremarkable (Tr. 1065).  A gastric emptying study was normal (Tr. 1067), as was a CT of the abdomen (Tr. 1069).  MRIs of the thoracic lumbar spine were also normal (Tr. 1486, 1505).  A physical examination was negative for headaches (Tr. 1103).  During Plaintiff's hospital stay, he was diagnosed with septic thrombophlebitis of the left upper extremity (Tr. 1126).  Followup imaging studies of the lungs show a septic embolism of the lung (Tr. 1176).  December 29, 2016 records note no chest pain, fever, depression, or anxiety (Tr. 1220).  Plaintiff was discharged in stable condition on January 6, 2017 (Tr. 1453).

In February, 2017 Ravinder Gandhi, M.D. performed a post-inpatient followup examination noting a normal examination but noted "bilateral lung abscesses" related to the staph infection during the hospital stay (Tr. 1583).  Plaintiff did not include headaches among his "active problems" (Tr. 1584).  June, 2017 records by Paul Cornello, M.D. noted that Plaintiff's nausea was resolved with treatment (Tr. 1632).  He recommended abstaining from marijuana use (Tr. 1632).  In August, 2017, Plaintiff reported to Dr. Ahmad that he had not had a seizure in over eight months, but reported daily headaches (Tr. 1576).  A chest x-ray from the same month was unremarkable (Tr. 1651).  September, 2017 records by social

worker Monica Spiller note that Plaintiff currently lived with his father, mother, new girlfriend, and her two children (Tr. 1550). He reported "many close friends in the community" (Tr. 1550). Plaintiff reported that a recent bout of vomiting had been triggered by a fight with his parents (Tr. 1601). Plaintiff was told that his chronic vomiting was caused by his daily marijuana use (Tr. 1603).

Occupational therapy records from November, 2017 note Plaintiff's report that he was able to complete activities of daily living and assist in making meals (Tr. 1676). He demonstrated a normal upper extremity range of motion and was able to carry 15 pounds over 100 feet (Tr. 1677-1678). He was able to sit for 45 minutes, stand for 15, and walk for 10 (Tr. 1679). The occupational therapist concluded that Plaintiff was capable of exertionally light work (Tr. 1679).

In January, 2018, Dr. Ahmad noted Plaintiff's report of "daily worsening headaches" but that the "migraines" were "not intractable" (Tr. 1573-74). Plaintiff sought emergency treatment on the advice of his therapist due to a "suicide plan" precipitated by the pressure of living with his parents, girlfriend, and two children (Tr. 1611). Plaintiff was discharged after feeling "much better" and "less emotional" than when first evaluated (Tr. 1612). Dr. Ahmad's March and April, 2018 records note Plaintiff's report of daily headaches (Tr. 1565, 1568).

On April 3, 2018, Dr. Verma composed a letter on behalf of Plaintiff's application for SSI, stating that Plaintiff had a history of epilepsy and COPD (Tr. 1644). Dr. Verma noted

that the "mental status of depression and PTSD affects [Plaintiff's] living routine and well-being" (Tr. 1644).  On April 11, 2018, Dr. Ahmad opined that Plaintiff should not "drive a vehicle, operate heavy machinery, work from elevated heights, or swim/bathe unassisted" due to "intractable headaches and epilepsy" (Tr. 1645).  On April 19, 2018, Eliot Garcia opined that Plaintiff was physically unable to work any length of time" due to the conditions of epilepsy, renal disorder, gastrointestinal issues, COPD, and a staph infection (Tr. 1647). Garcia noted that due to medical and mental issues, Plaintiff had a poor short term memory, poor concentration, and anxiety in public (Tr. 1647).  Pulmonary function testing from the same day was essentially unremarkable (Tr. 1657).

On April, 23, 2018,  neuropsychologist William J. Medick, Ph.D. performed an evaluation of Plaintiff, noting that Plaintiff was fully oriented with good eye contact and grooming (Tr. 1690).   Dr. Medick found that the condition of bipolar disorder was exacerbated by the condition of epilepsy (Tr. 1691).  He advised Plaintiff to continue periodic counseling and neurological treatment (Tr. 1692).

### 2. Non-Treating Sources

In March, 2017, Meryl Held, D.O. performed a non-examining review the consultative and treating records, finding that Plaintiff was capable of a full range of exertional activity but precluded from the climbing of ladders, ropes, and scaffolds and work involving "hazards" such as machinery and heights (Tr. 91-92).  The same month, Dyan Hampton-Aytch, Ph.D. performed a non-examining assessment of Plaintiff's psychological

conditions, finding moderate limitation in understanding, remembering, and carrying out detailed instructions; maintaining concentration for extended periods; interacting with the general public; and responding appropriately to workplace changes (Tr. 94). Dr. Hampton-Aytch noted that Plaintiff's activities included going out with others, using public transportation, shopping, reading, and interacting with his family (Tr. 95).

### C.   Vocational Expert Testimony

The ALJ adopted a September 14, 2015 finding by a previous ALJ that Plaintiff's past relevant work as a cashier clerk and fiberglass fabricator were semiskilled and performed respectively at the light and medium exertional levels[2] (Tr. 62-63, 80). The ALJ posed the following question to VE McBee, describing an individual of Plaintiff's age, education, and work background:

> [T]he ability to perform a full range of work at all exertional levels except no climbing of ladders, ropes or scaffolds; no working at unprotected heights or around moving mechanical parts; no operating a motor vehicle; further limited to simple, routine and repetitive tasks in a non-fast-paced work environment, not at a production-rate pace, so no assembly line work, for example. With

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. The VE originally testified that the maintenance work was actually performed at the light level then corrected himself (Tr. 1110-1118). Plaintiff testified that the maintenance job was performed at the sedentary level (Tr. 1110).

regard to exercise of judgment, the individual is limited to being responsible for simple work-related decisions, and the individual is able to respond appropriately to frequent interaction with supervisors, co-workers and the public.   With respect to tolerating changes in the work routine setting, the individual is limited to simple work-related decisions.   Would such an individual be capable of performing the Claimant's past work? (Tr. 63).

The VE found that the above restrictions would preclude Plaintiff's past relevant work but would allow for the unskilled work of a kitchen helper (380,000 positions in the national economy); hand packager (70,000); and dining room attendant (140,000) (Tr. 64).  He testified that if the original restrictions were amended to restrict the individual to only exertionally light work, the individual could perform the work of a housekeeping cleaner (230,000); merchandise marker (283,000); and sorter (60,000) (Tr. 64-65).  The VE stated that if the individual were further limited to occasional exposure to extreme cold or heat and concentrated fumes, odors, dusts, gases, and poor ventilation, the job numbers would not change (Tr. 65).

The VE stated that the need to be off tasks for 10 percent or more of the  workday, miss more than one day of work each month, or miss more than 10 days of scheduled work each year would eliminate all competitive work (Tr. 65-66).  The VE stated that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 66).

### D.  The ALJ's Decision

Citing the medical records, ALJ Kerber found that Plaintiff experienced the severe impairments of "epilepsy; cyclic vomiting syndrome or cannabinoid hyperemesis syndrome;

cannabis abuse; C-difficile; irritable bowel syndrome; gastro-esophageal reflux disease ('GERD'); migraines; and mental impairments variously diagnosed as bipolar disorder, depression, anxiety, [PTSD], and borderline personality disorder," but that none of the conditions met or medically equaled the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-16).  As to the mental impairments, the ALJ found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others and in concentration, persistence, or pace, but only moderate limitation in adaptation or managing himself,(Tr. 18-19).  The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with the following additional restrictions:

> [H]e cannot climb ladders, ropes, or scaffolds; he cannot work at unprotected heights or around moving mechanical parts; he cannot operate a motor vehicle; he can perform simple, routine, and repetitive tasks in a non-fast paced work environment, not at a production rate pace (e.g., no assembly line work); with regard to exercising judgment he can make simple, work-related decisions; with respect to tolerating changes in the routine work setting he can tolerate simple, work-related decisions and he requires a work routine that is repetitive from day to day with few and expected changes; and he can tolerate occasional interaction with coworkers, supervisors, and the public (Tr. 20).

Citing the VE's findings (Tr. 64-65), the ALJ determined that while Plaintiff was unable to perform his past relevant work, he could perform the unskilled work of a housekeeping cleaner, merchandise marker, and sorter (Tr. 25).

The ALJ discounted Plaintiff's allegations of disability.  She noted that Plaintiff's mental conditions appeared to be "stable" with treatment (Tr. 22).  She cited Plaintiff's

September, 2017 statement to a treater that he was able to function without psychotropic medication (Tr. 22).  She noted that Plaintiff's headaches were treatable with medication (Tr. 21).  As to the alleged mental impairments, she noted that the March, 2017 non-examining findings reflected a greater degree of psychological limitation than found by another ALJ in September, 2015 (Tr. 23).

The ALJ accorded significant weight to Dr. Verma's findings regarding Plaintiff's physical limitations but "no weight" to Dr. Verma's "narrative medical source statement" regarding Plaintiff's psychological limitations (Tr. 23 *citing* 1644).  The ALJ likewise gave "little weight" to therapist Garcia's "disability" opinion, noting that it was unsupported by the rest of the record (Tr. 23 *citing* 1647).  She noted that Plaintiff's psychological problems were "responsive to outpatient treatment" and that treating records showed "adequate impulse control and insight" (Tr. 23).  She noted that Plaintiff's seizures were controlled and infrequent (Tr. 23).  She accorded various GAF scores assigned by treaters "limited weight" reasoning that they were not reflective of Plaintiff's long-term psychological condition (Tr. 23).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229,

-13-

59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted).  The district court reviews the final

decision of the Commissioner to determine whether it is supported by substantial evidence.

*Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g).   "Substantial evidence is defined as

'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*

*v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of*

*Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of

choice' within which decision makers can go either way, without interference from the

courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*).  Where substantial

evidence supports the ALJ's decision, the reviewing court "defers to that finding even if

there is substantial evidence in the record that would have supported an opposite

conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir.

2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in

determining whether the evidence is substantial, the court must "take into account

whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health &*

*Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the

administrative record as a whole, and may look to any evidence in the record, regardless

of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human*

*Services*, 884 F.2d 241, 245 (6th Cir. 1989).

-14-

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Her v. Commissioner of Social Sec.*, 203 F.3d 388, 391–92 (6th Cir. 1999).

## V.  ANALYSIS

In his sole argument for remand, Plaintiff contends that the Residual Functional Capacity ("RFC") found in the administrative opinion did not adequately account for limitations resulting from either his headaches or psychological conditions. [ECF No. 16, PageID.1769].

-15-

As a threshold matter, Plaintiff's claim that the ALJ did not "consider" the allegations regarding the headaches or mental conditions is not well taken.   The ALJ explicitly acknowledged that Plaintiff complained of daily headaches and that the condition  was treated with medication (Tr. 20-21).  In discussing Plaintiff's allegations and the medical evidence, she concluded that the complaints of "chronic headaches" were adequately accounted for by limiting him to simple, routine, and repetitive work with only occasional interaction with others (Tr. 21).  The ALJ also provided a thorough discussion of the mental health treating records (Tr. 22-23).  Her thorough discussion and conclusions regarding the medical evidence   include the statement that Plaintiff's condition "appear[ed] to be stable with mental health treatment" (Tr. 22).   Her findings are consistent with my own review of the record.  *See* II.B.1-2, *above.*

Plaintiff's contention also fails to the extent that he seems to argue that the ALJ's Step Five determination is not supported by substantial evidence.   The purportedly deficient  RFC  found in the ALJ Kerber's determination contains the same limitations in the "hypothetical" question she posed to the vocation expert at the administrative hearing (Tr. 20, 63-65).  *See  Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010)(job testimony given in response to hypothetical question constitutes substantial evidence only if it accurately reflects the claimant's physical and mental impairments).  However, the ALJ permissibly declined to endorse Plaintiff's professed degree of impairment due to headaches or psychological problems.  Plaintiff's claim that his headaches prevented him

from performing unskilled work is undermined by treating records showing that he continued to interact with numerous acquaintances in the community; the absence of any treating observations that he actually appeared to experience headaches at the time of his medical appointments; and his ability to develop and sustain a live-in relationship with a girlfriend and two children who moved in with him during the relevant period (Tr. 1550). While Plaintiff reported ongoing headaches to his treating sources during the relevant period, he did not seek emergency treatment for the headaches and the headaches/migraines were consistently deemed "not intractable"[3] (Tr. 1565-1566, 1568-1569, 1573-1574, 1576-1577).   Although Plaintiff reported headaches on a regular basis to his treating sources, none of the imaging studies support the professed intensity or frequency of the alleged headaches.   As discussed above, the ALJ acknowledged the headaches but permissibly noted that the record supported the finding that the condition did not preclude unskilled work (Tr. 21).

The ALJ's rationale for declining to find that the headaches and mental problems were not disabling likewise does not provide grounds for remand.   Plaintiff's claim that the ALJ understated his mental health limitations stands at odds with treating records showing the consistent ability to focus, a "friendly and cooperative" manner, and the

---

[3]

While on April 11, 2018 Dr. Ahmad composed a letter on behalf of Plaintiff's SSI application stating that Plaintiff had "intractable" headaches, Dr. Ahmad's treating notes from the same day (Tr. 1565-1566) and his earlier treating records state consistently that the headaches were "non-intractable" (Tr. 1568-1569, 1573-1574, 1576-1577)

ability to interact successfully with others  (Tr. 554, 640, 1583-1584).   The ALJ acknowledged but permissibly accorded "little weight" to therapist Garcia's finding that Plaintiff lacked the concentrational abilities to perform unskilled work, noting that therapy records showed "adequate impulse control and insight" and that the record as a whole showed the psychological symptomology was well controlled (Tr. 23).   She cited Plaintiff's September, 2017 statement that he did not require psychotropic medication (Tr. 22). To the extent that Plaintiff would argue that the epileptic seizures created psychological limitations, the ALJ noted that the treating records showing that the epileptic seizures were "infrequent" and that "seizure precautions" included no use of ladders, ropes, scaffolds, heights, mechanical parts, or driving (Tr. 20, 23).  As such, the ALJ did not err by omitting a number of Plaintiff's claims from the hypothetical question to the VE.  *See  Stanley v. Secretary of Health and Human Servcs*., 39 F.3d 115, 118-119 (6th Cir. 1994)(ALJ not obliged to credit rejected allegations of limitation in the question to VE or by extension, in the ultimate RFC).   More generally, because the ALJ's rationale for only partially crediting the allegations of limitation is well supported and explained, her weighing of Plaintiff's allegations against the other evidence of record is entitled to deference. *See Cruse v. Commissioner of Social Sec*., 502 F.3d 532, 542 (6th Cir. 2007)(ALJ's determination is entitled to "great weight"); *see also Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989))(*quoting Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir. 1986))("ALJ's evaluation of the professed limitations must stand unless 'patently wrong

in view of the cold record'").

In closing, I note that the record supports some degree of impairment due to epilepsy and the psychological conditions.  However,  the non-disability determination is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and thus, should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment [Docket #18] be GRANTED and that Plaintiff's motion [Docket #16] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to

which it pertains.  Not later than 14 days after service of an objection, the opposing

party must file a concise response proportionate to the objections in length and

complexity.  The response must specifically address each issue raised in the objections,

in the same order and labeled as "Response to Objection #1," "Response to Objection

#2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
United States Magistrate Judge

Dated: April 27, 2020

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on
April 27, 2020 electronically and/or by U.S. mail.

s/Carolyn M. Ciesla
Case Manager